State of Georgia, and we'll just give counsel an opportunity to come up to the tables and for the courtroom to settle down before we get started. We're going to wait just a moment. All right, we'll hear first from Mr. Petroni. I'm sorry, can I ask you, and we're going to start your time over again. We're not hearing you, and I want to make sure that it gets picked up. I'm sorry, we probably need to get one of those podiums that goes up and down, but it's perfect for shorties like me. As long as no one takes this as me being tired or bored, I'm okay with it. No, we appreciate your working with us on this. Well, thank you, Your Honor. So, Section 2 of the Voting Rights Act is concerned with minorities lacking equal access to the political system on account of their race. It is not concerned with majorities simply outvoting minorities on the basis of ordinary partisan politics. That is just partisan voting, not racial block voting as the district court called it here. But the greater irony in this case is that, regardless, black voters in Georgia have broad success in electing their preferred candidates. They make up around 31% of the voting population, but 36% of the congressional delegation, half of the federal senate delegation, around a quarter of the state legislative delegation. And if you move to black preferred candidates as opposed to black candidates, the numbers go even higher. Both of the federal senate seats and over 40% of the state legislative delegation. In other words, statistically overrepresented across the board. As early as Whitcomb v. Chavis, the Supreme Court made clear that racial vote dilution requires racial injury, not just partisan disagreement. And in Georgia, where minorities... But in this case, I mean, the district court made factual findings that it wasn't, that the race issue and the partisan issue were sort of inextricably intertwined here because of the historical evidence that was admitted into the proceedings. And there are factual findings to that effect. So you'd have to show they're clearly erroneous. Well, two points on that, Your Honor. First of all, I think it was actually legal error to say, well, I can't disentangle race and partisanship, and so, therefore, I don't need to. I mean, as recently as last year, the Supreme Court said in a racial gerrymandering claim, and I recognize that racial gerrymandering is slightly different, but it said you can't just say, well, these two things are tightly bound together. Therefore, if you've shown partisan gerrymandering... But didn't the court make other findings that were more specific? I mean, for example, didn't the court find, didn't the court cite evidence that even in districts where the black preferred candidate was elected, that the great majority of those candidates happened to be white? And that in districts where, or the great majority in districts where 40% or more of the population was white, then those candidates also were white. And then if it was in a majority black population, the candidates that won were black. So why doesn't that finding that the district court made support the district court's finding that race was primarily responsible? So, two points on that, Your Honor. The first point I want to make clear is, and I want to address that question, but the district court specifically held, both at the motion for summary judgment and in the order that's on appeal, that it did not need to disentangle race and partisanship, and that it was not going to do so for the racial block voting inquiry, as we said that the district court should. But the racial block voting inquiry is in the three preconditions under Gingles, right? Well, yes, that's where we think it should go, absolutely. That's what you're arguing, though, right? Yes, but I do want to get to your point. The district court made essentially two, what I would assert the plaintiffs are calling factual findings. One, the district court said, well, race and partisanship, well, race is a good predictor of partisanship. I mean, no one's denying that. That's what it means to be highly correlated. Of course it's a good predictor. They're highly correlated. That means you have to disentangle them. It doesn't mean that you just give up. And the only piece of evidence that the district court pointed to for the idea that actually it's race driving these voting patterns, not partisanship, is what Your Honor pointed to, which was a single graph from not even one of the racial polarization experts that shows the vast majority of cases where you have lots of white voters in the district, they elect Republicans, and where you have lots of black voters in the district, they elect Democrats. There are a few, this is a tiny sample size, there are a few cases, maybe one to five, depending on which graph you're looking at, in a single election year where white Democrats won in slightly white-majority districts. However, there is no— I don't think that's accurate. My recollection, I'm sorry, I don't have it at my fingertips, but my recollection was it was something like four out of 17 seats where black candidates won in districts where there were 40 percent or more whites. I mean, even when the Democratic candidate won. No, so this is my point. I don't want to quibble about whether it was four or six. My point is broader than that. But it's not just an absolute number, right? We're looking at the number in proportion to the total number. Yeah, but my point is that one way or the other, you're talking about a single year where no one looked at, for instance, were those white Democratic candidates the black-preferred candidate in the primary? There's no evidence they weren't. And again, this is one year. We have evidence going on. All right. Well, in any case— But the point being, Your Honor, that I do not think that one way or another this could possibly justify the district court's decision to effectively set this question aside and say— Well, let me ask you a question about that, though, because the three gingles preconditions. Really, it only talks about that the minority group must be able to show that it is politically cohesive, politically, right? I mean, so on the one hand, you'd expect that you'd see them all voting for a particular—well, not all, but politically cohesive—that the minority group would be voting in the majority for the same political group. I mean, that is actually a defining precondition, right? Okay. And on the second, it says that the minority—well, this is really the third—the minority group must be able to show that the white majority votes sufficiently as a bloc. And so—and there's nothing in the three preconditions about that bloc being a racial—the racial consideration there. The racial consideration comes in in the Senate, in the Senate factors, which we consider once we get to the gingles section. So two basic points about that, Your Honor. The first is even if you were to put this analysis of whether voting patterns are racially caused or just normal partisan politics in the totality of the circumstances, I think you still have to address that question, and I think it's dispositive. Well, I agree you have to— Every circuit has agreed with us on that point, but I do think— Well, let me ask you this. The way I understand the setup is that once the three preconditions have been satisfied and we look to the—then we look to the Senate factors, and then the defendant in the case can present evidence that the disparity is based not on race but on some other basis, right? I mean, that's basically how it works. Are you disagreeing with that framework? I do slightly disagree with that, Your Honor. So— Where does that come from? If you go back to gingles, the one disagreement among the otherwise majority that turned into a plurality was that Justice White specifically said, I do not think that you can look at racial bloc voting by looking at a bare number of who does the majority vote for and who does the racial minority vote for. And he specifically declined to join the majority opinion on that point. And Justice O'Connor said she agreed with Justice White. It's got to be more than the mere fact that a majority is voting differently from a racial minority. Now, it is true that even once you show that, even once you show some sort of racial causation, it might be that due to a totality—you know, you look at all the totality of circumstances, minority voters still have equal access. I mean, like, that might just be the case. And that's what the totality is there for. But I don't think that you get past jingles by saying, well, we've got clear partisan polarization here, and so now we're on to the totality test. I don't think that's the correct way of thinking about it. I don't think that's the way that the court set it up in jingles. And I think that, you know, even if—again, though, you disagree— But I think you're—I think—I just want to make sure I'm understanding your argument. Your argument is that the race has to be considered in the—the reasons why the minority group is voting as a bloc, whether it's race-based or politically-based, has to be considered in the preconditions. That's your argument, right? Well, to be clear, as to whether the minority is voting cohesively, it doesn't really matter why or what's causing that, if they're voting cohesively. The reason it matters what is causing the majority voting—like, is it racial patterns or is it partisan patterns—is precisely because that's the supposed injury. The injury is— But again— You're not electing candidates. Can I just get you to answer this one question? Is your argument that the minority group has to show that race is the reason that they're voting together in the preconditions? Not the minority group. You're talking about the majority. Yes, I'm talking about the majority group. And here's what I'm—let me give you an example of what I'm talking about. In this very case, the evidence is virtually undisputable that when you change the race of a candidate, the majority votes the exact same. But when you change the partisan affiliation of the candidate, it changes drastically. So we know that the majority votes for—the white population votes for Democrats about 11% of the time. It doesn't matter what the race of the candidate is. Isn't that what it showed when—with the Senate race with Hershel Walker and the current senator? Yes, and there is plenty of other evidence as well. Plaintiffs' own experts said that black voters have no problem electing or nominating their preferred candidates in their primaries. And if you look at those primaries, the black and white voters agree with each other about 50% of the time, disagree about 50% of the time. If you look at recent elections, especially in the Senate race, you have a black Republican beating multiple serious white candidates in the primary, really crushing them, getting 67% of the vote. I mean, there's plenty of indication here that there's partisanship. There's almost no indication that anyone—any voting patterns are shifting one way or the other because of either the race of the candidate— But, you know, that just sort of ignores history and the reason why so many black voters happen to vote for the Democratic Party in Georgia. I mean, that just ignores the history of what's happened, you know, over 200-plus years in Georgia. I don't think it ignores that history at all, Your Honor. But the point is that under Section 2, the injury is if you lack equal access as compared to other members of the electorate. And if the majority is not voting against black candidates or black preferred candidates for that reason, but just voting against them because they're Democrats, then you are in the exact same position as white Democrats, Asian-American Democrats, Hispanic Democrats. But, you know, if you look at the Senate factors—and I agree that race plays a role in it. I'm not suggesting otherwise. But if you look at the Senate factors, the Senate factors include, among other things, the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process. Now, a lot of this, the district court found, was explained by the fact, the history that we have here, as to why it was that the Democratic candidates more recently, obviously not in the past, were more responsive to these kinds of concerns for black voters. So, I mean, it seems to me like you're asking us to completely ignore the role that race has played and how we've gotten here. And we can't do that either. Your Honor, I'm certainly not asking you to ignore anything. I will say for one part of this is that, as the Supreme Court has said numerous times, and this Court has said on many occasions as well, it can't be that, you know, the sins of the past forever taint everything that Georgia is doing. I mean, no one's doubting that 50 years ago that Georgia was a very... Well, I think it was much more than 50 years. I mean, it was closer in time than 50 years ago, and it goes on to this day. I mean... Let me be clear, Your Honor. I don't think the plaintiffs have identified any evidence of official intentional discrimination in the last four decades. I don't think there's any of that in the record. And I also think the district court said these maps were not enacted with any racial intent at all. The district court did say that. You're right. But my point is simply... And just like any other factual finding, it's entitled to deference. But my point... But so are the other factual findings. Well, my point there is simply, of course the Senate factors take into account a lot of things, but if you haven't shown the injury in the first place, the fact that the majority is voting against black and black-preferred candidates with respect to race, then there's no reason to look to the Senate report factors because you haven't shown the injury in the first place. All right. Thank you, Mr. Petrani. We'll hear next from Attorney Khanna. Thank you, Your Honors. Good morning. May it please the Court. Abba Khanna on behalf of the Pendergrass and the grant plaintiffs. The Secretary's primary argument is to try to shoehorn a causation requirement into Jingles 3, but he cannot point to a single precedent that actually imposes this requirement on Section 2 plaintiffs under the Jingles preconditions. Instead, the Secretary proposes a new formulation of the Jingles standard, based not on any actual holding or precedent from this Court or the Supreme Court, but on his preferred understanding on the way Section 2 should operate. But at the end of the day, Your Honors, it is not for this Court to rewrite the Jingles standard. And it certainly was not legal error for the District Court to adhere to that well-established standard that was reaffirmed by the Supreme Court while this very case was pending. In 2023, in Allen v. Milligan, the Supreme Court reaffirmed, word for word, the three Jingles preconditions that have governed Section 2 claims for nearly 40 years. And there, the District Court found that the evidence of Jingles 2 and 3 was very strong, where Black preferred candidates garnered on average more than 92% of the Black vote, and just 15.4% of the White vote. The Supreme Court held in that case that the District Court, quote, faithfully applied our precedents, and accordingly found no basis to upset the District Court's factual findings or legal conclusions as to satisfaction of those Jingles preconditions. In this case, Your Honors, the District Court faithfully applied that very same precedent in the same way, and the numbers and the facts here are only more stark. Here, the parties stipulated that Black voters are extremely cohesive, voting for their preferred candidates with an average exceeding 98%. They stipulated that White voters are highly cohesive in opposition to Black preferred candidates. In every one of 40 elections analyzed, with an average of only 12.4% of the vote. And they stipulated that Black preferred candidates were almost always defeated in these polarized elections outside of majority Black districts. The Secretary's own expert conceded that the pattern of racial polarization in this case is striking and remarkably stable. As in Alabama, Your Honors, the Secretary here has offered no basis to disturb the District Court's careful factual findings or its legal conclusions on the Jingles preconditions. This same well-established Jingles standard has been applied time and again in this circuit. In Nipper v. Smith and on Bank 11th Circuit plurality, recognized that proof of the second and third Jingles factors is itself circumstantial evidence of racial bias. And the existence of those factors generally will be sufficient to warrant relief and establish a violation. A unanimous panel of this circuit subsequently adopted and reiterated this understanding in Burton v. City of Belgrade. Nipper further recognized that the defendant may rebut plaintiff's evidence, as Your Honor mentioned, by demonstrating as part of the totality inquiry the absence of racial bias in the voting community. That is the precise standard that the District Court evaluated and applied here. And unsurprisingly, it found the evidence of a non-racial explanation for Georgia's stark racial polarization severely wanting. It pointed to plaintiff's unrefuted expert testimony from historian Dr. Burton, who explained the historical relationship between race and partisan affiliation and how in Georgia specifically white voters fled the Democratic Party and flocked to the Republican Party specifically in response to black political participation and the Voting Rights Act. It pointed to expert analysis from Dr. Hanley, demonstrating that racial polarization in primary elections exists, where party was held constant. And as Your Honor pointed out, perhaps most importantly, under the Secretary's preferred framing, the District Court pointed to plaintiff's undisputed quantitative expert evidence, analyzing the relationship between the size of the white population in the electorate and the success of black candidates. And that is in the chart that Your Honor referenced at page 456 at the opinion. The data there clearly demonstrate that the success of black candidates in Georgia is inversely related to the percentage of white voters. And that white voters, white Democrats, fare better than black Democrats among white electorates. The Secretary offers nothing to explain away, let alone refute that evidence. The Secretary today suggested, well, that was just one chart or one year, but it actually was a conglomeration of multiple elections. And as part of the totality of circumstances, the District Court did exactly what it was supposed to do, look at all of the evidence presented and consider that. The Secretary has very little footing to point to anything else. After all, his own expert testified that he did not even examine Dr. Burton's testimony, Dr. Burton's expert report in evaluating the conclusions on racially polarized voting, that he offered no empirical evidence of his own, and that he could not offer any opinion as to the causes of racially polarized voting on this record. That is defendant's expert. The District Court found from this evidence, far from what my friend on the other side said, that the District Court just set this question aside, far from it. The District Court examined, explained, and evaluated all of this evidence and specifically found that partisanship is not the best logical explanation of racial voting patterns in Georgia. Instead, the evidence only confirms what the stark numbers showed, that racial polarization in Georgia is extreme and it is dispositive. The Secretary's understanding of causation, Your Honor, not only fails as a matter of law, it fails as a matter of logic. It is telling, in his telling, voting is not truly polarized by race if members of different races self-segregate into different political parties. But the very opposite is true. When members of one race select overwhelmingly into one party and members of another race select overwhelmingly into the opposing party, then party politics is racial politics. The Secretary cannot... I mean, how could you fulfill the second Gingell's precondition without having a situation like that? The second Gingell's precondition, as you're right, Your Honor, absolutely requires that political cohesion. Cohesion on any other element would not satisfy the Gingell's standard of actions. But even more fundamentally, Your Honor, the Secretary cannot muster any non-racial explanation for why black and white voters in Georgia have so neatly and so consistently separated into different political parties. If it is in fact entirely unrelated, as the Secretary seems to suggest, then there should be all else being an equal shuffling of black and white voters among the parties. That is not what we saw here. That is not what the district court saw here. And the district court dug deeper into the evidence to find the reasons why that is the case and whether the part of an explanation is somehow a better explanation than the most obvious one that the Gingell's factors suggest. And the district court found otherwise. In short, the Secretary cannot even come close and does not even come close to offering evidence. Doesn't even come close to offering an explanation as to the absence of racial bias, which is his burden. The Secretary also aims his fire at the district court's findings under Senate Factor VII, essentially arguing that black representation in Georgia has come far enough. But over the past century, Your Honors, we can count on one hand the number of black candidates who have won statewide office in partisan elections, and on one finger the number of black candidates elected to the U.S. Senate. And contrary to the Secretary's suggestion, one-off wins in races for public service commissioner and labor commissioner are no substitute for the biannual opportunity to elect local champions to state and federal offices. Even more telling, while the Secretary repeatedly touts the fact that Georgia's congressional delegation includes five black members, four of those representatives are elected from majority black districts, and not one of Georgia's representatives has ever been elected from a majority white district. This only shows the evidence that proves our point that the only reliable way to deliver meaningful electoral opportunities to black voters in Georgia is to draw majority black districts in the areas that Jen Dingell requires. Ultimately, Your Honor, the Secretary would have this court declare that black voters have done enough winning in Georgia, that they should be satisfied with some opportunity and stop aspiring to the equal opportunity that Section 2 promises. And as the district court recognized in a careful opinion, that is wrong. It's wrong on the law, it's wrong on the facts, and we respectfully ask this court to affirm. All right, thank you, counsel. We'll hear next from Mr. Bokat Lindell. May it please the court, Noah Bokat Lindell for the United States. The United States intervened in this case to defend the constitutionality of Section 2 of the Voting Rights Act as well as to address the issues of racial causation and private enforcement. On those issues, this court should hold, first, that Section 2 plaintiffs are not required to prove that racially polarized voting is caused by racial bias. Second, that private plaintiffs can enforce Section 2 either through an implied private right of action or via Section 1983. And third, that Section 2 is constitutional 15th Amendment enforcement legislation as the Supreme Court just reaffirmed in Milligan. Because racial causation has been the main focus of the argument so far this morning, I'd like to start there and make a few points, and then if I have time, make one point on constitutionality. On racial causation, I'd like to just step back a bit from all the discussion of the record in this case and discuss the general legal principles. The Supreme Court clarified in Milligan that the statutory phrase on account of race just means with respect to race. It does not require proof of intent either on the part of the legislature or on the part of the majority block electorate. There is only one causation standard in Section 2, as the court has recognized since Jingles. That causation standard is that the challenged law must interact with social and historical conditions to cause an inequality of opportunity for one racial group as compared to others. And the Jingles test already accounts for race at every step of the process. To pass the Jingles preconditions, plaintiffs must prove that minority voters cohesively vote consistently for their chosen candidates, but that the racial majority block is consistently voting for different candidates and usually votes as a block to defeat the minority preferred candidates. As the Supreme Court noted in Milligan, and this court said in Marengo County and Nipper, the proof of the second and third Jingles preconditions creates a presumption that the map is thwarting a distinctive minority vote because of race. And that presumption makes sense for all the reasons that my co-counsel has just discussed. You would normally think that parties would sort themselves rather evenly between races, and the fact that people of different racial groups are sorting themselves into parties suggests that the partisanship, the reason for the parties, has something to do with race. But then, even if you get past the preconditions, plaintiffs must prove at the totality of circumstances stage that the jurisdiction has the sort of intensive racial politics that perpetuates the effects of past discrimination. And when layered on top of those intensive racial politics, the district map then causes an inequality of opportunity for minority voters. Now, the Secretary has asked this court to adopt a standard, a legal standard, that no court has adopted. The eight justices in Jingles disagreed with the Secretary's position that the plaintiff is required to prove racial causation. I would point the court to pages 100 to 101 of Jingles, that's Justice O'Connor's opinion, where she said, agreed that the reasons why we have the second and third Jingles preconditions, there's no requirement, there's no way that that can be rebutted by the defense. But she just said that it does not have to be irrelevant to the totality of circumstances. And nine circuits, including this one, have addressed this question. We pointed to those cases on a footnote on page 13 of our brief. And all of them, including this one, have placed the burden on defendants to disprove the presumption of racial causation created by meeting the Jingles preconditions. That includes the Fifth Circuit. Now, eight of those circuits, including this one, all but the Fifth Circuit, have followed those eight justices in Jingles who said that this is a totality of circumstances test. Lulek v. Clements in the Fifth Circuit stands alone on that issue in placing it in the Jingles preconditions. It decided that case 30 years ago. Every other circuit to address the issue, including this one, has come after that, and they've all disagreed with Clements. What do we do with our decision in Greater Birmingham Ministries versus the Alabama Secretary then? My understanding is that Greater Birmingham Ministries was a vote denial case, not a vote dilution case, so it wasn't following the Jingles standards that have been set out. And in Milligan, the Supreme Court reaffirmed that the third precondition means that there is a plausibility that race is the cause for the difference. So Milligan pretty much abrogates our decision in Greater Birmingham Ministries? I wouldn't say that it abrogates the decision, but just that decision, because it's dealing with a vote denial claim, it's not in the Jingles line of cases. And to the extent there's any tension there, the Supreme Court's decision in Milligan clarifies. Okay. So what's your position on this language from Greater Birmingham? The language of Section 2A of the VRA requires only proof of discriminatory results, not of discriminatory intent. That's right. And that's, as the Supreme Court then pointed out in Milligan, this is an effects test. It's not an intent test. And so the phrase on account of race just means with respect to race. I think she's asking, and you can correct me if I'm wrong. I don't want to put words into your mouth. I think what she's asking is when it says that it requires, that it's discriminatory, that it's requiring the showing that race is the reason, the primary reason, or the reason, I guess, why it is that the voting is different, right? I don't think that anything in Greater Birmingham Ministries says that. Again, it wasn't even dealing with racially polarized voting. It was dealing with the vote denial claim. And the Supreme Court's precedence since Jingles, and including in Milligan, which came after Greater Birmingham Ministries, reaffirmed that the Jingles preconditions only require a statistical showing of cohesive block voting by the different races. It does not require this separate racial causation requirement. And for the reasons that I've just been stating this morning, the Jingles test overall, including the Senate factors, is meant to affirm that presumption that race is playing a role here by showing that there are intensive racial politics in this jurisdiction that the state is then layering over with its map and that that is working together to cause this inequality. All right. Did I get it right? Yes. Okay. Thank you. Next, we'll hear from Ms. Laiken. Is it Laiken-in? Laiken. Laiken. Thank you. May it please the Court, Sophia Laiken from the ACLU on behalf of the Alpha Phi Alpha Appellees. As Ms. Kanna and Mr. Bokat Lindahl have laid out, this Section 2 appeal involves only a straightforward application of the familiar Jingles framework. The District Court methodically applied that framework to an extensive record and a detailed analysis spanning 519 pages. While the Secretary quibbles with some of the Court's findings, there is ample evidence in the record to support the Court's findings and thus no basis to argue error, let alone clear error. Beyond that, the only legal arguments the Secretary identifies are, as Ms. Kanna and Mr. Bokat have laid out and pointed out, ones that cannot be squared with precedence from the Supreme Court and this Court. This Court should affirm. I'd like to just briefly address a few additional points. Mr. Petrani suggested that you need to have an injury from the preconditions, the Jingles preconditions themselves. The Jingles preconditions do create that inference of injury because they mean that racial polarization is leading to dilution by submerging minority voting strength. And as the Court in Milligan stated, and this demonstrates the dilution by submergence dynamic and that it is occurring at least plausibly on account of race. You then turn, of course, through the totality of the circumstances to look at whether under the totality of the circumstances we are seeing that there is less opportunity for minority voters on account of race resulting in unequal political opportunities. I would also want to push back on the suggestion that the District Court had said that he was not disentangling race and partisanship. What he had said in the opinion was that he could not resolve the global question of whether or not what is causing voting behavior. However, what he could do was look at the evidence that was presented in this case. And he did that quite extensively, looking at the massive record before him that there is quite extensive racial polarization, the massive stark and stable pattern of racially polarized voting over nearly six dozen elections across multiple years. He goes to the clear pattern where black candidates' success is going down as white population district goes up, the evidence that there is some polarization in primary elections where partisanship can necessarily not be a factor driving racial division. Expert historical analysis has pointed out that racial division in voting in Georgia has a long history that both precedes and continues to drive the current political alignment. And there was evidence as well that race divides the political parties themselves, including the fact that the Republican Party has elected just two black state legislators since 1908. And that's not even considering the rest of the evidence that the court considered under the totality of the circumstances demonstrating the role that race and racial division and racial inequality play in Georgia politics across the other Senate factors. I point out that the Secretary does make a few isolated observations about the evidence regarding the success of a single Republican black candidate in a Republican primary, as well as some comparison of levels of support of white and black voters for candidates of different races. These are isolated instances, isolated observations that just cannot overcome the weight of the evidence that plaintiffs have reduced on the question of racial polarization. And finally, to the extent that Mr. Petrany suggests that the district court's finding of a Section 2 violation here somehow means that Section 2 is a tool of Democratic entrenchment, Section 2 doesn't care about party. It only cares about whether minority voters and white voters are consistently preferring different candidates, regardless of party. Where the relevant minority group here, the black voters, have equal opportunity, that simply means that they have a meaningful opportunity to pull, haul, and trade their way to political power despite racial polarization. When that happens, no one outcome is foreordained. Black voters can stop voting for Democrats and start voting for Republicans. If Republicans run a candidate that appeals to black voters and represents their interests, then in the districts where black voters have an opportunity to elect a candidate of their choice, the candidate who wins may well be a Republican candidate. If there are no further questions, I will turn the podium over. All right, thank you. Thank you. All right, Mr. Petrany, I'm going to give you a couple extra minutes because we took Mr. Bocott, Lindell, and Ms. Khanna over a little bit. Thank you, Your Honors. There's a lot to get to, but the first thing I want to make clear is this is not some new standard, and Allen v. Milligan has nothing to do with this case. Allen v. Milligan was a Jingles 1 question. All that Allen v. Milligan said about Jingles 2 and 3 was they had been satisfied in the district court, no one was arguing otherwise, that's all it said. What we're talking about is the question whether racial block voting has to actually be racial block voting as opposed to just partisan block voting, and that question was disputed in Jingles. The United States' position that somehow Justice O'Connor agreed with the majority on this is objectively wrong. Justice O'Connor disagreed with the majority on the entire concept of Jingles. Let me ask you a question, though logically. I mean, we have said that although if you satisfy the first three preconditions under Jingles, that there's a presumption and it's going to be a rare case when you're not going to find that there's a violation. We have said also that there are circumstances where there wouldn't be a violation, haven't we? Haven't we said that? What I'm saying is there can be circumstances. We've said there can be circumstances where you satisfy the first three preconditions of Jingles, but on the totality of the circumstances, we might conclude that there's not a violation of Section 2. No, that's definitely true. Right? Okay. If it were the case that you would resolve at the front, at the top part of this, that it was racial, that the reason for the block voting was racial in nature, then I don't see how that could be the case that you would get to the conclusion that the two answers on those could ever be different. No, that's absolutely the case, Your Honor, because again, and I actually think the fact that this Court has said that there's this kind of, you've sort of presumably shown a Section 2 violation by getting through the first three Jingles factors, I think only makes sense if you've shown that there's like voting patterns somehow connected to race as opposed to just ordinary partisan politics. Otherwise, that presumption doesn't make any sense. But absolutely, let's say you have a situation where you— Well, I mean, again, the reason that it might make sense is because of the history as to— and when you're talking about a figure like we have here of 98 percent of the black voter population voting with a particular party and the overwhelming majority of the white population voting with the Republican Party, then, you know, why isn't that relevant race information? Well, my point is that if what you're seeing in elections is that if the race of the candidate changes or if you look at primary elections, you're not seeing the same sort of split, then you're not really seeing anything racial. And I do want to push back on some of the claims that plaintiffs just made about what the party and nonpartisan election data show. But my main point here is Council for Plaintiffs just said that party politics is racial politics. The Supreme Court just said a year ago you can't say that. You can't just assume that because parties are voting one—people are voting for party one way— Like, for example, when Senator Warnock had his first race, he ran against a Republican candidate that was white, correct? Yes, and defeated her. Then he ran against a Republican candidate that was black and defeated him. And isn't that the best evidence, the fact that it is partisan and not racial? Yes, I think that's extremely strong evidence. I also think the fact that—this is remarkable to me. They tried to diminish as isolated evidence all of the evidence on what the white majority is voting for. There is no change based on the race of the candidate on who the white majority votes for. That's not isolated. That's literally every election. They said that in the primaries there was still racial polarization. That's just not true. The only data we have on that is from their expert, Dr. Hanley, who first of all said primaries are not a problem for black voters. But second of all, if you actually look at the numbers, again, about half the time black and white—the black plurality and white plurality agree. About half the time they disagree. That's just ordinary partisan politics. But I want to get to the point— But you're agreeing that—your argument is, well, yes, there could be a Section 2 violation if you can show that there is—that it's based on race, right? Yeah, if you have— That the voting patterns are based on race, right? Voting patterns that appear to be based on race. Okay. So there would be—under your theory, then, there would never be any reason to go to the totality of the circumstances inquiry because you would have proven your case on the preconditions. Why is that not— I disagree with your argument. Okay. Explain. I think you need a Supreme Court case that did just that. Johnson v. DeGrande, the Supreme Court basically said, like, yeah, you have proven that there's racial bias and all this, but it doesn't matter because you're electing so successfully that it just doesn't matter. You are—you do, in fact, have equal access because you are electing basically what anyone might expect you to elect one way or the other. So it doesn't matter that you have this— But it didn't determine—it didn't— Okay. But it didn't determine that the racially polarized voting— well, that it was—that it was based on race at the preconditions section of Gingell's. Well— It went to the totality of the circumstances. Well, but to be clear, what they—what the Court said was that you have proven that and you have proven this racial bias. So under our understanding of the way that this would work, they basically got past the first three and then said, but it—or the prerequisite— Right. But my point—my point is there's a certain way that we do the analysis. You're saying that at the first step, the preconditions, that—that it must be shown for a Section 2 violation that it was— it was because of race that the voters voted a certain way, right? That's what you're saying. Yes, there has to be— Okay. And that's what I'm pushing back on, and I'm not understanding where that's coming from because I don't see it in the preconditions themselves. I don't see it in the case law. And logically, I don't see how it makes sense in the analysis. Well, to be clear, Your Honor, in Gingell's, again, I think five justices said you should be looking at beyond the raw vote totals of majority versus minority. But even if you think it was only one justice that said that, at the very least, there was no agreement on that among the Court. So I think that in Gingell's, you at least have this issue teed up, whether or not it was resolved. And then, contrary to what the United States says, the Fifth Circuit, first of all, they agree, is on our side on this. The Fifth Circuit held, yeah, you have to show racial patterns of voting to get past Gingell's 3, otherwise there's nothing there. If you don't have racial patterns of voting, there's no potential racial injury here. The other— Racial patterns of voting is different than race-based, right? Like, what you're attributing, what you're saying is race-based, right? You're saying it's because of race that a vote went a certain way. You're saying that has to be proven in the preconditions. Yeah, I think that what you're seeing is— What is your support for that? Well, the text of Section 2, among other things, which says it has to be on account of race. Again, Justice White's concurrence, and I think Justice O'Connor's concurrence, if you actually read it correctly. And I think that basically every court to look at this has agreed with us. I do acknowledge that several of them have said, well, we can do that in the totality phase, although the Seventh Circuit said, you know, maybe we should do it in the totality, but you could also do it at jingles. It doesn't really matter. Because the key point is that this is a dispositive question, one way or the other, that you have to establish. You can't just say, well, the majority is voting differently from the minority. Now let's just look at all of these factors. You have to figure out, well, is the majority voting differently somehow connected to race? And if it's not, if it's just the party number, the party letter changes, the R changes to a D, the vote changes dramatically, but the race of the candidate or the perception of, you know, this is the black-preferred candidate changes, and that doesn't affect anything, we're not in Section 2 territory. So, you know, for those reasons, and obviously there's much more in our briefs, but for those reasons, we think that the Court should reverse the judgment. All right. Thank you, counsel.